# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| EDUARDO ARENCIBIA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | CIVIL ACTION |
| v. ) | |
| ) | No. 09-CV-2581-KHV |
| RICHARD BARTA, TRACEY TRAMMEL, ) | |
| BRAD METZ, PHIL HIGDON, SAM LEONE, ) | |
| and MICHAEL KOLBEK, ) | |
| ) | |
| Defendants. ) | |
| _____) | |

## MEMORANDUM AND ORDER

Under 42 U.S.C. § 1983, plaintiff alleges that defendants violated his constitutional rights under the Fourth, Fifth, Sixth and Fourteenth Amendments during and after a traffic stop on November 7, 2007 in Shawnee County, Kansas. Specifically, plaintiff claims that (1) Tracey Trammel and Brad Metz violated his rights under the Fourth Amendment by searching and seizing his truck, trailer and currency; (2) Phil Higdon violated his rights under the Fifth and Sixth Amendments by refusing his request for counsel and (3) Richard Barta, Sam Leone and Michael Kolbek violated his rights under Fifth and Fourteenth Amendments by applying and perpetuating a policy which directed that seized currency not be maintained and secured as evidence in civil forfeiture cases. Plaintiff brings all claims against defendants in their individual capacities. This matter is before the Court on Defendants' Motion To Dismiss Or In The Alternative Stay (Doc. #5) filed December 7, 2009. Defendants seek dismissal or a stay under Rule 12(b)(1), Fed. R. Civ. P., and Younger v. Harris, 401 U.S. 31 (1971), arguing that the Court should abstain because this case involves important state interests and an ongoing state

1

proceeding which provides an adequate forum to hear the claims.

For reasons stated below, the Court overrules defendants' motion.

## **Factual Background**

Plaintiff's complaint (Doc. #1), as supplemented by various court filings and orders in a related case in Kansas state court, may be summarized as follows:[1]

Three times on November 7, 2007, Shawnee County Sheriff's Deputy Tracey Trammel saw plaintiff's red and white semi-tractor cross the fog line to the shoulder of westbound I-70.[2] After the third time, Trammel activated his lights and dash camera and plaintiff pulled over. As Trammel approached plaintiff's vehicle he noticed that the trailer was locked and that different logos had been applied to and removed from it, which is known as "ghosting." Trammel spoke with plaintiff and climbed into the passenger side of the semi-tractor. Plaintiff appeared to be extremely nervous: his hands were shaking and he did not make eye contact with Trammel.[3] Trammel obtained plaintiff's license, registration and insurance (all of which were valid), and asked plaintiff his origin and destination and whether the truck was "driving alright." Plaintiff responded that he had hauled a load of watermelon to Massachusetts and was returning to Las

---

[1] The Court's factual background is based in large part on the complaint and the memorandum opinion and entry of judgment dated May 29, 2009 ("State Memorandum Opinion") in the District Court of Shawnee County, Kansas in State ex rel. Shawnee County Sheriff's Office v. $551,985.00 US Currency, 1998 Freightliner Tractor, VIN:1FUYSDYB5WP705279, 1997 Great Dane Trailer, VIN:1GRAA0626VW011315, No. 07C1572, attached as Ex. 2 to defendants' motion to dismiss. See Doc. #5-1.

[2] Trammel has extensive training in drug trafficking and interdiction and conducts law enforcement training on these subjects. He worked as an over-the-road trucker for 11 years and he still maintains his commercial driver's license.

[3] Most people are nervous during a traffic stop and Trammel watches to see whether nervousness increases or decreases throughout the stop. Plaintiff's nervousness did not increase.

Vegas with an empty trailer because the truck had power problems and a mechanic in New Jersey wanted to charge too much to fix it.[4] Trammel asked where and from whom plaintiff had obtained the truck. Plaintiff responded that he had purchased the truck from a friend to whom he was making payments, but whose name he could not remember. Trammel concluded that plaintiff was not impaired or tired and his eyes were not bloodshot, but he believed that plaintiff had been paying more attention to Trammel following him than to his driving.

Because of this, Trammel believed that plaintiff might be involved in criminal activity and asked to see documents, including the bill of lading and plaintiff's logbook, which he took to his patrol car to review. According to the bill of lading, plaintiff should have picked up a load of cantaloupe at Del Monte in Phoenix, Arizona on October 25 between 7 a.m. and 7 p.m., but his logbook showed that he picked up the load on October 26 at 8:30 p.m., which was after Del Monte closed. The documents which plaintiff gave Trammel included a weigh ticket from Albuquerque, New Mexico dated two days after the pickup. Trammel thought it was strange that plaintiff had traveled only 500 miles in two days with a time-sensitive load along a route which bypassed all weigh stations in Phoenix. Trammel also thought it was strange that the logbook showed that the truck had entered service on October 1 but made no trips until October 24, 2007. The logbook also indicated that plaintiff had been in New Jersey in February – not November – of 2007.

Trammel conducted an EPIC search which showed that in 2004, though plaintiff had not

---

[4] Trammel found plaintiff's story suspicious; typically a driver will not drive across the country to get a truck fixed because of the risk of incurring astronomical tow costs associated with blowing a motor or otherwise breaking down "in the middle of nowhere." He also found it suspicious that plaintiff would haul a locked empty trailer across the country because he would not make any money doing so. Truck repair facilities exist all over the country and usually a driver will get his truck fixed and then pick up a load to try to offset the repair expense.

been arrested, charged or convicted, narcotics had been found in a truck in which plaintiff was a passenger.[5] Before returning to plaintiff's vehicle, Trammel radioed "well, I'm hoping to get his attorney fees," an apparent reference to a potential forfeiture action.

Trammel returned to plaintiff's truck and returned the documents to plaintiff. He gave plaintiff a warning, said "I appreciate it" and then without stepping down from the truck asked plaintiff if he could ask him more questions. Trammel did not tell plaintiff that he was free to leave. At this point, the emergency lights on Trammel's patrol car were still on and three other officers were present.[6] Trammel asked plaintiff about the weigh ticket from New Mexico. Plaintiff responded that an axel on his trailer (which was supposed to shift to allow for proper weight distribution) had been stuck and that he had tried to fix it. Trammel asked plaintiff whether he had ever been arrested. Plaintiff responded that he had not. Trammel then asked whether plaintiff had any illegal contraband or money. Plaintiff responded that he did not. Trammel stated that he wanted to see inside plaintiff's trailer and plaintiff consented. Trammel then asked plaintiff to step out of the truck. Trammel patted plaintiff down and found approximately $1,200.00 in $10.00 bills rubber-banded together. Trammel then asked for the keys to the trailer.

Two other officers attended to plaintiff while Trammel and Brad Metz, a sergeant with the Shawnee County Sheriff's Department, searched the trailer and found nothing.[7] Trammel then searched the cab. In the sleeping berth he found a duffle bag which contained two black trash bags full of money. Trammel did not know how much money was there and did not

---

[5] The record does not reveal what an EPIC search is or involves.

[6] The record does not reveal when these officers arrived.

[7] The record does not reveal the names of these officers.

attempt to count it at that time. Officers then handcuffed, arrested and removed plaintiff from the scene.

Trammel drove plaintiff's truck to the Sheriff's Office shop, where he again searched the truck and found another suitcase of money. He placed the suitcase and duffle bag on the sleeping berth. Trammel also found several prepaid cell phones or cards and a bundle of six different truck weigh scale tickets from Phoenix, all dated October 26, 2007, each reflecting an increased truck weight. Metz had his drug dog Cisco run a drug sniff around and inside the truck. Cisco alerted to the presence of narcotics by scratching the duffle bag. Metz did not mention this fact in his supplemental narrative report,

After the search at the shop, Trammel and Metz took the bags of money to the Law Enforcement Center ("LEC") in Topeka, the headquarters for the Shawnee County Sheriff's Office. They took the money to a conference room table where they broke up the rubber-banded bundles and counted the money by denomination, running every bill through a counting machine. The machine reportedly counted $526,025.00, though at some point Metz recorded a total amount of $564,025.00 on his dog deployment report. They put the money into unsealed evidence bags which they placed in a box. Metz did not know where the box came from or whether it had been previously used to transport evidence, and Cisco did not sniff the box before the money was put into it. Officers hid the box in an automobile bay and Metz conducted another search with Cisco. Cisco alerted on the money in the box, which was hidden under a table.

Cisco has given false positive alerts in the past, and his indications are the only evidence which linked the currency to drugs. Metz did not look for or find narcotic residue on the currency. During the vehicle search officers found no marijuana, cocaine, heroin, drug pipes or

other drug devices.

Plaintiff was taken to the LEC, where Phil Higdon, a sergeant with the Shawnee County Sheriff's department, interviewed him. Higdon found that plaintiff did not understand all of his questions and that he required a Spanish-speaking interpreter. To prevent misunderstanding or miscommunication, Higdon asked Paul Tavares, a Sheriff's Office process server, to interpret. Higdon and Tavares advised plaintiff of his Miranda rights in English and Spanish and he agreed to speak to them. Higdon asked plaintiff if everything in the cab belonged to him, and plaintiff said that it did. Higdon then asked plaintiff where he got the large sum of money, and plaintiff asked for an attorney. Higdon told plaintiff that he would be arrested and transported to the Department of Corrections, where he could meet with his attorney. Plaintiff then stated that he did not want to go to jail and, after continued discussion, again requested an attorney. Higdon told him "no." Plaintiff then asked to speak with Higdon alone. Tavares left the room and Higdon told plaintiff "you're in a world of shit you know that . . . and you just asked for an attorney." Higdon told plaintiff that he was in serious trouble because he had over half a million dollars in his truck with no acceptable explanation for it. Higdon then decided to take a break for a few minutes, and plaintiff asked to use the restroom.

When plaintiff returned from the restroom, Higdon and Tavares entered the interview room and explained that Higdon could not speak with plaintiff again unless plaintiff initiated the conversation. Higdon then asked plaintiff if he wanted to speak with him. He said "yes" and, after Higdon and Tavares again advised him of his Miranda rights, plaintiff agreed to talk. Plaintiff said that the money belonged to someone named Jose whom he had met in Las Vegas through mutual friends. "Jose" had offered plaintiff $10,000 to pick up approximately $500,000 in New Jersey after dropping off the load of cantaloupes in Massachusetts. "Jose" instructed

plaintiff to meet two men at a truck stop where he would pick up the money. "Jose" did not describe the men to plaintiff; he told plaintiff that they would know to look for him. Plaintiff followed these instructions and found the men with the money at the truck stop. Plaintiff said that the money did not fit in the suitcase so he put some of it in his bag. Plaintiff was supposed to return to Las Vegas, where he would call "Jose" to determine where to meet to give him the money. Plaintiff and "Jose" contacted each other by phone several times throughout the trip for instructions and status checks. After the interview, Tavares left and provided no further translation for plaintiff. Outside the interview room, Higdon presented an ownership disclaimer form to plaintiff. Higdon did not ask anyone to translate the form into Spanish. Plaintiff signed the form and renounced ownership of the money, truck and trailer and listed "Jose" as the owner.

On November 8, 2007, Shawnee County Sheriff's Department Captain Michael Kolbek and Lieutenant Sam Leone retrieved the currency from the property room at the Sheriff's Office. Pursuant to department policy, they took the money to a bank where it was re-counted. Pursuant to department policy, they then exchanged the cash – $551,985.00 – for a cashier's check which they deposited with the Shawnee County Treasurer.

The State of Kansas charged plaintiff with violating K.S.A. § 65-4142(b) and (c), transporting/management of drug proceeds. District Court of Shawnee County, Case No. 07-C-1572. Chief Judge Nancy Parrish dismissed the criminal case with prejudice after finding that because the currency had been returned to circulation, evidence that it represented drug proceeds was not available for discovery.[8]

In the District Court of Shawnee County, the State of Kansas then filed a forfeiture case

---

[8] Although plaintiff was detained at the Shawnee County jail for approximately nine days he does not bring any claims relating to that detention.

against the truck, trailer and currency. Although plaintiff had disclaimed ownership of the truck, trailer and currency, he filed a claim in the forfeiture proceeding. At trial, plaintiff and his wife (Odalys Serrano) testified that on October 30, 2007, on his way to Massachusetts, he had found a dark blue bag at a truck stop in Max Meadows, Virginia. He took the bag to his truck and discovered that it contained trash bags full of money. He then called his wife. Both of them worried that someone might come after him: plaintiff thought that the money might be stolen, gang-related or kidnapping ransom; his wife thought that the money was abandoned. Plaintiff put the money in his duffel bag and suitcase because the bag in which he found it in was "a little dirty." He then continued to Massachusetts. After dropping off his load, he went to New Jersey, where he spent three days of "down time" and had his truck partially repaired. Plaintiff paid $542.00 for repairs. Even though he purportedly possessed more than $500,000.00 in cash, he rejected an estimate for an additional $4,000.00 worth of repairs because it was "too high."

Shawnee County District Court Judge Franklin Theis entered an order of forfeiture regarding the currency. That order is on appeal to the Kansas Court of Appeals. Judge Theis concluded that the traffic stop, search and seizure were proper under the Fourth Amendment and Section 15 of the Kansas Bill of Rights. Judge Theis specifically concluded that Trammel's training and background as a commercial truck driver caused him to develop "red flags" of reasonable suspicion of criminal activity. Trammel's reasonable suspicion led to the search, which turned up a duffle bag full of cash, which led to a reasonable suspicion that a felony had been or was being committed, which justified confiscating the truck, trailer and money. See State Memorandum Opinion at 27-41, Doc. #5-1 at 10-14.

Judge Theis also concluded that the interview by Higdon was proper under the Fifth Amendment. Specifically, he found that plaintiff had been properly "Mirandized" and that

8

Higdon had procured an interpreter to prevent misunderstandings. Based on the testimony and the videotape of the interview, Judge Theis concluded that plaintiff's statements were admissible and without constitutional taint because (1) plaintiff gave them knowingly, voluntarily and intelligently after full warning of his rights and (2) Higdon clearly disclaimed benefits to plaintiff, took a break to attenuate any overreaching circumstances and explained to plaintiff that he had to initiate any further conversations. See State Memorandum Opinion at 41-45, Doc. #5-1 at 14-15.

Plaintiff asserted a spoliation claim based on defendants' decision to exchange the cash for a cashier's check and the lack of other evidence which tied the cash to drugs. Judge Theis denied plaintiff's due process challenge to the admissibility of evidence because he had not presented evidence of bad faith or intentional wrongdoing. In particular, the fact that the drug dog alerted on the money (before Sheriff's Department employees put it through the counting machine or into the box) diminished plaintiff's argument that the money should have been excluded from evidence because plaintiff had no opportunity to independently test it. Finally, Judge Theis concluded that plaintiff (1) had no ownership interest in the currency, which represented the proceeds of unlawful drug activity, and that he therefore lacked standing to make a claim against it in the forfeiture proceeding and (2) owned the semi-tractor and trailer before he transported the currency and that he therefore had a valid exemption claim as to them. Judge Theis therefore sustained the forfeiture claim as to the currency and denied it as to the semi-tractor and trailer. See State Memorandum Opinion at 45-47, Doc. #5-1 at 15.

On June 24, 2009, plaintiff appealed Judge Theis' order regarding the currency.

## Analysis

Under Rule 12(b)(1), Fed. R. Civ. P., and Younger v. Harris, 401 U.S. 37 (1971),

defendants seek dismissal or stay of this case, arguing that this Court should abstain because the claims relate to the traffic stop, which is the subject of the pending forfeiture proceeding in the Kansas Court of Appeals.

Rule 12(b)(1), Fed. R. Civ. P., governs motions to dismiss for lack of subject matter jurisdiction. Rule 12(b)(1) motions generally take the form of facial attacks on the complaint or factual attacks on the accuracy of its allegations. Holt v. United States, 46 F.3d 1000, 1002-03 (10th Cir. 1995) (citing Ohio Nat'l Life Ins. Co. v. United States, 922 F.2d 320, 325 (6th Cir. 1990)). In a facial challenge, the district court must accept the allegations of the complaint as true. Stuart v. Colo. Interstate Gas Co., 271 F.3d 1221, 1225 (10th Cir. 2001). In a factual challenge, a party may go beyond allegations contained in the complaint and challenge the facts upon which subject matter jurisdiction is based. Id. Courts may exercise jurisdiction only when specifically authorized to do so, see Castaneda v. INS, 23 F.3d 1576, 1580 (10th Cir. 1994), and must "dismiss the cause at any stage of the proceeding in which it becomes apparent that jurisdiction is lacking." Scheideman v. Shawnee County Bd. of County Comm's, 895 F. Supp. 279, 280 (D. Kan. 1995) (citing Basso v. Utah Power & Light Co., 495 F.2d 906, 909 (10th Cir. 1974)); Fed. R. Civ. P. 12(h)(3). Because federal courts are courts of limited jurisdiction, the law imposes a presumption against jurisdiction. Marcus v. Kan. Dep't of Revenue, 170 F.3d 1305, 1309 (10th Cir. 1999). Plaintiff bears the burden of showing that jurisdiction is proper, see id., and must demonstrate that the case should not be dismissed, see Jensen v. Johnson County Youth Baseball League, 838 F. Supp. 1437, 1439-40 (D. Kan. 1993). Conclusory allegations of jurisdiction are not enough. Id.

Younger abstention is jurisdictional. D.L. v. Unified Sch. Dist. No. 497, 392 F.3d 1223, 1228 (10th Cir. 2004) (citing Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 100 n.3, 118

S. Ct. 1003 (1998)). It applies to state court civil proceedings and extends to federal claims for monetary relief when a judgment for the plaintiff would have preclusive effects on a pending state-court proceeding. D.L., 392 F.3d at 1228. Under Younger, a federal district court must abstain from hearing a federal case which interferes with certain state proceedings. Phillips v. Martin, 535 F. Supp.2d 1210, 1214 (D. Kan. 2008). Younger dictates that a federal district court abstain from exercising jurisdiction over federal claims when (1) a state criminal, civil or administrative proceeding is pending; (2) the state court provides an adequate forum to hear the claims raised in the federal complaint and (3) the state proceedings involve important state interests, matters which traditionally look to state law for their resolution or implicate separately articulated state policies. Id. at 1214-15. Absent extraordinary circumstances, abstention is mandatory when these elements are satisfied. Id. at 1215. Because the Court finds that the underlying state action is not the type of proceeding due deference under Younger, it does not reach the second or third elements.

For a civil or administrative proceeding to be "pending" under Younger, the Tenth Circuit requires that it be both ongoing and the type of proceeding which is due deference under Younger. Brown ex rel. Brown v. Day, 555 F.3d 882, 888 (10th Cir. 2009). Defendants note, and plaintiff does not dispute, that a civil forfeiture case under the Kansas Standard Asset Seizure and Forfeiture Act, K.S.A. § 60-4101 et seq. ("KSASFA"), remains ongoing between plaintiff and Shawnee County, Kansas before the Kansas Court of Appeals. See Phillips v. Martin, 535 F. Supp.2d 1210, 1215 (D. Kan. 2008) (procedure ongoing if state appellate remedies not exhausted when federal complaint filed). The parties disagree about whether the state forfeiture action is "closely related" to the issues which plaintiff raises in this case. Neither

11

party cites any authority, however, that this element requires a close relationship or explains how to determine whether one exists.

To determine whether a proceeding is subject to Younger abstention, the Court examines two factors. Brown, 555 F.3d at 888. First, the Court looks at who initiated the state proceeding – plaintiff or the state. Id. Proceedings initiated by the state against a plaintiff to enforce a law or regulation are coercive and subject to abstention. Id. Conversely, proceedings which a plaintiff initiates to right a wrong inflicted by the state are remedial. Second, the Court differentiates between cases in which the federal plaintiff contends that the state proceeding is unlawful (coercive and subject to abstention) and those where the federal plaintiff seeks a remedy for some other state-inflicted wrong (remedial). Id.[9]

In Brown, the Tenth Circuit analyzed the first Younger prong to determine whether a state administrative proceeding was the type entitled to Younger deference. Brown, 555 F.3d at 884. There, plaintiff filed a federal lawsuit to challenge a state administrative agency decision to terminate Medicaid benefits. The Tenth Circuit concluded that it was not the type of case which warranted Younger deference. It did so because (1) plaintiff, not the state, initiated the state administrative proceedings after the state terminated her benefits, and the state did not compel her to participate in the proceedings; and (2) plaintiff did not seek to enjoin the state proceedings; but sought relief from the state's allegedly unlawful conduct by recovering Medicaid benefits. Id. at 889.

Here, as to the first factor, the state initiated the underlying proceeding to enforce its

---

[9] In Brown, the Tenth Circuit also notes a third factor which appears in cases where abstention is appropriate. If the federal plaintiff committed an alleged bad act and then seeks to thwart the state proceeding initiated to punish the plaintiff for that bad act, the state proceeding is coercive. Id. at 891.

12

forfeiture laws. It brought the action against the confiscated items, however, and not plaintiff personally. Plaintiff opted to voluntarily participate. While some circuits have concluded that forfeiture proceedings are coercive because of their quasi-criminal nature, see, e.g., Loch v. Watkins, 337 F.3d 574, 578 (6th Cir. 2003); Postscript Ents., Inc. v. Peach, 878 F.2d 1114, 1116 (8th Cir. 1989), under Brown, this factor is neutral. Though the state initiated the proceeding to enforce its laws, it did not mandate that plaintiff participate in the forfeiture action.

As to the second factor – whether plaintiff contends that the underlying proceeding is unlawful or seeks a remedy for some other state-inflicted wrong – plaintiff seeks damages for violations of constitutional rights. As in Brown, plaintiff does not seek to enjoin the underlying forfeiture action. Rather, he seeks to secure relief for unlawful conduct by recovering damages, including his property. This factor is therefore remedial.

Because the underlying action is not coercive and is not the subject of this federal action, the state action is not the type of proceeding which is due deference under Younger. Accordingly, the Court overrules defendants' motion.[10]

**IT IS THEREFORE ORDERED** that Defendants' Motion To Dismiss Or In The Alternative Stay (Doc. #5) filed December 7, 2009 be and hereby is **OVERRULED**.

Dated this 14th day of September, 2010 at Kansas City, Kansas.

s/ Kathryn H. Vratil<br>
KATHRYN H. VRATIL<br>
United States District Judge

---

[10] Principles of res judicata or collateral estoppels may eventually bar some or all of plaintiff's claims, but they do not affect the Court's jurisdiction under Younger.