## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| **EDUARDO ARENCIBIA,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **CIVIL ACTION** |
| **v.** | ) | |
| | ) | **No. 09-CV-2581-KHV** |
| **RICHARD BARTA, TRACEY TRAMMEL,** | ) | |
| **BRAD METZ, PHIL HIGDON, SAM LEONE,** | ) | |
| **and MICHAEL KOLBEK,** | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |

## MEMORANDUM AND ORDER

Under 42 U.S.C. § 1983, plaintiff alleges that defendants, acting in their individual capacities, violated his constitutional rights under the Fourth, Fifth, Sixth and Fourteenth Amendments during and after a traffic stop on November 7, 2007 in Shawnee County, Kansas. Specifically, plaintiff claims that (1) Tracey Trammel and Brad Metz violated his Fourth Amendment rights by searching and seizing his truck, trailer and currency; (2) Phil Higdon violated his Fifth and Sixth Amendment rights by refusing his request for counsel; and (3) Richard Barta, Sam Leone and Michael Kolbek violated his Fifth and Fourteenth Amendment rights by applying and perpetuating a policy which directed that seized currency not be maintained and secured as evidence in civil forfeiture cases. This matter is before the Court on Defendants' Motion For Summary Judgment (Doc. #26) filed July 27, 2011. Defendants argue that (1) as a matter of law they did not violate plaintiff's constitutional rights, (2) they are entitled to qualified immunity and (3) plaintiff's claims are barred by collateral estoppel. In response to defendants' motion, plaintiff concedes that the Court should award summary

judgment on his Fifth, Sixth, and Fourteenth Amendment claims and argues that only his Fourth Amendment claim should survive summary judgment. For reasons stated below, however, the Court sustains defendants' motion in its entirety.

## I.   Legal Standards

### A. Summary Judgment

Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits, show no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56; accord Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986); Vitkus v. Beatrice Co., 11 F.3d 1535, 1538-39 (10th Cir. 1993). A factual dispute is "material" only if it "might affect the outcome of the suit under the governing law." Liberty Lobby, 477 U.S. at 248. The inquiry is whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law. Id. at 251-52.

A "genuine" factual dispute requires more than a mere scintilla of evidence. Id. at 252. The moving party bears the initial burden of showing the absence of any genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); Hicks v. City of Watonga, Okla., 942 F.2d 737, 743 (10th Cir. 1991). Once the moving party meets its burden, the burden shifts to the nonmoving party to demonstrate that genuine issues remain for trial as to those dispositive matters for which he carries the burden of proof. Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc., 912 F.2d 1238, 1241 (10th Cir. 1990). And, while the Court views the record in a light most favorable to the party opposing summary judgment, the nonmoving party may not rest on his pleadings but must set forth specific facts. Id. The nonmoving party cannot rely on ignorance of facts, on speculation, or on suspicion, and may not escape summary

judgment in the mere hope that something will turn up at trial.  Conaway v. Smith, 853 F.2d 789, 794 (10th Cir. 1988).  If the nonmoving party's evidence is merely colorable or is not significantly probative, summary judgment may be granted.  Liberty Lobby, 477 U.S. at 250-51.

### B.  Qualified Immunity

Government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly-established statutory or constitutional rights of which a reasonable person would have known.  Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).  Qualified immunity provides government officials immunity from suit as well as from liability for their discretionary acts.  See Mitchell v. Forsyth, 472 U.S. 511, 526–27, (1985).  The doctrine of qualified immunity serves the goals of protecting officials who are required to exercise their discretion and the related public interest in encouraging vigorous exercise of official authority.  Butz v. Economou, 438 U.S. 478, 506 (1978).

When defendants assert a qualified immunity defense at the summary judgment stage, the burden shifts to plaintiff to show that defendants violated a constitutional right and that the constitutional right was clearly established at the time of the alleged violation.  Vondrak v. City of Las Cruces, 535 F.3d 1198, 1204 (10th Cir. 2008).  To satisfy this burden, plaintiff must show facts which, when viewed in the light most favorable to plaintiff, show that defendants' conduct violated a constitutional right and that the right was clearly established at the time of the alleged violation.[1]  See Olsen v. Layton Hills Mall, 312 F.3d 1304, 1312 (10th Cir. 2002) (citing Saucier v. Katz, 533 U.S. 194, 201 (2001)). If plaintiff does so, the burden shifts back to defendants to prove that no genuine issues of material fact exist and that defendants are entitled to judgment as

---

[1]      District courts have discretion to determine the order of these steps in light of the circumstances at hand.  See Swanson v. Town of Mtn. View, Colo., 577 F.3d 1196, 1199 (10th Cir. 2009) citing Pearson v. Callahan, 129 S. Ct. 808, 817-18 (2009).

a matter of law. See Olsen, 312 F.3d at 1312. If the record shows an unresolved issue of fact relevant to the qualified immunity analysis, the Court must deny the motion for summary judgment. See id.

**II.     Facts**

The material facts, with disputes resolved in plaintiff's favor, are as follows:

Three times on November 7, 2007 Shawnee County Sheriff's Deputy Tracey Trammel saw plaintiff's red and white semi truck cross the fog line while traveling westbound on I-70. Trammel activated his emergency lights and stopped plaintiff's truck because failure to maintain a single lane is a traffic violation linked to vehicle rollovers.  A number of factors cause failure to maintain a single lane, including mechanical problems with the vehicle or a fatigued, intoxicated or nervous driver or one who focuses more on the officer than driving because he is engaged in criminal activity.

As he approached the cab, Trammel visually inspected the truck and trailer.  He noticed that the trailer was locked.  He also noticed significant "ghosting" on the trailer – where several different logos had been applied to and removed from the trailer, which indicated several changes of ownership,  Trammel approached the passenger side of the truck, climbed up the steps, and got permission from plaintiff, the driver, to enter the cab of the truck.  Trammel tried to get plaintiff to make eye contact to rule out driver intoxication.  Plaintiff would not make eye contact with Trammel and appeared extremely nervous to the extent that his hands were shaking, which Trammel viewed as a "red flag."

Trammel asked plaintiff if he was having medical problems or mechanical difficulties with his tractor or trailer. Plaintiff responded that both he and his truck were fine.  Trammel then asked for plaintiff's driver's license, logbook, bill of lading and other paperwork law enforcement officers may request to ensure drivers meet commercial driving restrictions. Trammel also asked what plaintiff

was hauling. Plaintiff handed over the logbook and told Trammel that he was returning to Las Vegas with an empty trailer after hauling a load of watermelons from Arizona to Massachusetts. Trammel – who had worked for eleven years as an over-the-road trucker before becoming a police officer and still maintained a commercial driver's license – found it suspicious that plaintiff would haul an empty trailer across the country because he would not make any money doing so. He then found plaintiff's locked trailer suspicious because in his experience as a professional truck driver, there was no reason – nor was it common practice – to lock empty trailers. Plaintiff also responded that he did not have a bill of lading, but then produced one which indicated that he had hauled cantaloupe (not watermelon); Trammel thought it odd that a professional truck driver did not know what he had hauled. By that time, Trammel had not found a reason why the truck had failed to maintain a single lane – plaintiff appeared to be sober and to have no medical condition or mechanical problems – and Trammel believed plaintiff was being dishonest.

Plaintiff then told Trammel that his truck was, in fact, having mechanical difficulties: the engine was not supplying enough power under load. Plaintiff said that he had received a $4,000 estimate to have the truck repaired in New Jersey, but decided to drive the empty trailer back to Arizona to get the truck fixed there. Trammel found this suspicious for two reasons. First, truck repair facilities exist all over the United States so most drivers will seek immediate repair and then pick up a load to try to subsidize the cost. Second, most drivers who experience motor or power problems would not risk blowing a motor "in the middle of nowhere" and the associated "astronomical" cost to tow the truck to a repair shop.

Plaintiff told Trammel that he had just purchased the truck from a friend, to whom he was making payments, but he could not remember the friend's name. The truck was titled in plaintiff's name and had been purchased within the past month. Trammel had received extensive training in drug trafficking and interdiction and knew that drug smugglers frequently title trucks in the driver's name to lend legitimacy to the smuggling operation. He also found plaintiff's explanation of the

payment arrangement odd because the seller had no lien or other recourse if plaintiff defaulted on payments.

Trammel returned to his patrol car with plaintiff's paperwork, where he had access to a telephone and could better examine the documents.  In examining the documents, Trammel found discrepancies and errors in the bill of lading and logbook.  First, plaintiff had picked up the load on October 25 according to the bill of lading but on October 26 according to the logbook.  The conflicting dates were another "red flag that something's not right here."  Trammel also thought it was strange that the logbook indicated that plaintiff had purchased the truck on October 1 but did not haul anything until October 24, because a professional truck driver only makes money by driving the truck.  He also saw a truck weigh ticket from Albuquerque, New Mexico dated two days after plaintiff picked up the load in Goodyear, Arizona.  He found this strange because plaintiff had (1) traveled only 500 miles in two days with a time-sensitive, perishable load and (2) bypassed all weigh stations in Phoenix and traveled to a different state before weighing the truck.  The logbook also mistakenly stated that plaintiff had been in New Jersey in February (not November).  While in the car, Trammel phoned the El Paso Intelligence Center ("EPIC")[2] to check plaintiff's immigration status and ran a wants and warrants check for active or outstanding warrants and prior case involvement.  From EPIC, he learned that in 2004, law enforcement officers in Texas seized 20 kilograms of cocaine and 1,000 pounds of marijuana during the traffic stop of a semi truck in which plaintiff was a passenger.

---

[2]     EPIC is a federally-funded agency based in El Paso, Texas and managed by the Drug Enforcement Administration ("DEA"), the Federal Motor Carrier Safety Administration, the U.S. Customs and Border Protection, and the Department of Homeland Security.  EPIC maintains entry records of border crossings from any vehicle or person entering the United States from any foreign country, immigration records, National Crime Information Center wants and warrants, and DEA criminal investigation records. During traffic stops or drug investigations, a certified law enforcement officer can access EPIC by giving his name, password and reason for the stop or inquiry.

Trammel had decided to issue plaintiff a warning for the traffic violation but believed that plaintiff was "probably involved in further criminal activity." By this time, Sergeant Brad Metz had arrived on the scene. Trammel told Metz about the EPIC hit, the locked-but-empty trailer, plaintiff's statement that he had hauled watermelons but later produced a bill of lading for cantaloupes, the truck being off duty from October 1 through October 25, and plaintiff traveling from Las Vegas to Phoenix and then reweighing in New Mexico. Trammel told Metz that a possible reason for the reweighing in New Mexico was that the truck had gotten heavier after he had picked up a load of dope. Trammel also said "well, I'm hoping to get his attorney fees."

Trammel determined that further investigation was necessary, exited his vehicle and walked to the cab of the truck with plaintiff's license, registration, logbook and paperwork. He climbed back onto plaintiff's truck, returned plaintiff's items and gave him the warning ticket, saying "I appreciate it." Trammel never told plaintiff that he was free to leave. At this point, at least four officers were on the scene. Trammel then reinitiated contact and asked if he could ask plaintiff a few more questions. Plaintiff responded "yeah, go ahead." Trammel sought to clarify why plaintiff weighed his truck in Albuquerque and not Phoenix. Plaintiff answered that he had been trying to fix an axle which was stuck so he would be of legal weight over that axle. The axle was supposed to shift to allow for better weight distribution. Trammel thought plaintiff's explanation sounded false because it did not explain why plaintiff went to a different state to weigh. Trammel then asked plaintiff if he had ever been arrested. Plaintiff responded that he had not, but because of the EPIC report, Trammel believed that plaintiff was lying. Trammel then asked if plaintiff had any illegal contraband – such as marijuana, heroin, cocaine, or methamphetamine – in the truck. Plaintiff said no. Trammel asked if plaintiff he had any illegal money in the vehicle, to which plaintiff responded "no."

Trammel asked plaintiff for permission to search the truck and plaintiff said yes. Trammel reconfirmed and again asked plaintiff if he understood that he was giving Trammel permission to search the vehicle. Plaintiff said "yes" again. Trammel then asked plaintiff to step out of the truck

and patted him down.  In plaintiff's pocket he found approximately $1,200 in $10 bills, all rubber-banded together.  Trammel found this suspicious both because the money was all $10 bills, and because much of the money he had previously seized as drug currency was similarly rubber-banded.

Trammel asked for and obtained the trailer keys from plaintiff. At this point, Trammel told plaintiff "I appreciate you giving me permission to search, OK.  You understand?"  Though plaintiff spoke with broken, accented English, Trammel believed that he and plaintiff understood each other. Trammel was comfortable with the conversation and had no indication that plaintiff did not understand what he was saying.

Trammel found nothing during his search of the trailer.  In the cab, however, he found a large black duffel bag in a storage compartment under the bunk in the sleeper portion.  The bag contained two black trash bags which were filled with money that was all rubber-banded together.  When he found it, Trammel did not know how much money was there.  With the money, Trammel also found several dryer sheets, which drug smugglers commonly use to mask the small of narcotics from drug-detecting dogs.

After finding the bag of money, Trammel placed plaintiff under arrest for possession of drug proceeds.   Another officer transported plaintiff to the Law Enforcement Center ("LEC") in downtown Topeka while Trammel personally drove the truck approximately seven miles to the Sheriff's office shop off Silver Lake Road.  Trammel drove at "highway speeds," 35 to 40 miles per hour on two-lane roads, and up and down on and off ramps and around curves. He experienced no power problem and had no problem steering, shifting, pulling the trailer or keeping the trailer between the lines on the road.  The trailer did not shimmy or sway in any way.  At the shop, Trammel photographed the truck and searched the cabin again, finding another bag full of rubber-banded currency and dryer sheets under the sleeper bunk. He then put both bags of money on the sleeper bunk and asked Metz, a K-9 officer for more than ten years, to run a drug sniff around the

truck and inside the cab with Cisco, his certified narcotic detection dog.  Cisco alerted to the presence of narcotic odor by scratching one of the bags of money.

During the second search, Trammel also found several prepaid cell phones and cards which drug cartels frequently use because they do not store the numbers dialed on them and there is no way to trace calls back to the cartel.  Trammel also found a bundle of six truck weigh-scale tickets from Phoenix, Arizona dated October 26, 2007.  Each subsequent ticket reflected an increased truck weight. Trammel found it very unusual that plaintiff weighed his truck six times in one day and then again two days later and only 500 miles away in Albuquerque, New Mexico.  After they finished searching the truck, Trammel and Metz loaded the bags of money into Metz's patrol car and drove them to the LEC in Topeka, where the Shawnee County Sheriff's Office is headquartered.

The next morning, on November 8, Shawnee County District Court Judge Mark Braun signed an arrest report minute sheet indicating that he had found probable cause to believe that plaintiff was in possession of drug proceeds and set plaintiff's bail at $100,000.  On November 14, the Shawnee County District Attorney filed a criminal complaint charging plaintiff with possession of drug proceeds in violation of the Uniform Controlled Substances Act, K.S.A. § 65-4101 et seq.  On May 30, 2008, Shawnee County District Court Judge Nancy Parrish dismissed the criminal charges against plaintiff because the currency had been placed in circulation and was not available for discovery.

On November 9, 2007, the Shawnee County District Attorney filed asset forfeiture proceedings in Shawnee County Case No. 07-C-1572. The petition sought forfeiture of the truck, trailer and currency.  At trial, plaintiff claimed that the initial stop, search, seizure and questioning violated his constitutional rights.  His attorney introduced evidence and cross-examined witnesses including Trammel and Metz.  At trial, Trammel enumerated the following red flags as his indicia of reasonable suspicion to conduct a further investigation:  (1) plaintiff was extremely nervous, so much so that his hands visibly shook and he would not make eye contact; (2) the trailer was empty and yet

locked, which in Trammel's experience as a truck driver was unnecessary and uncommon; (3) plaintiff had hauled an empty trailer from Massachusetts and intended to return to Las Vegas empty and was therefore realizing no income from the return trip; (4) plaintiff first stated that he did not have a bill of lading and had hauled watermelons, but in fact he did have a bill of lading and had hauled cantaloupes; (5) plaintiff planned to drive from Massachusetts to Las Vegas to have the truck repaired more cheaply, when it was risky to drive a truck with mechanical problems so far; (6) when asked for supporting documentation about the truck repair estimate, plaintiff could not provide any paperwork or details; (7) plaintiff supposedly owed money on the truck but had a no-lien truck title, which was a common practice among drug smugglers; (8) plaintiff bypassed truck stops in Phoenix and drove 500 miles to weigh several times in Albuquerque; (9) plaintiff's logbook showed the truck entering service on October 1, 2007 but making no trips between October 1 and 24, 2007; (10) the bill of lading and the logbook contained different dates as to the date of pick-up of the load to Massachusetts; (11) the logbook showed the truck being in service before plaintiff purchased it; (12) the trailer had a good deal of 'ghosting,' indicating that it had been purchased over and over again; and (13) plaintiff was previously involved in a drug trafficking case involving a semi truck.

On May 29, 2009, Shawnee County District Judge Franklin Theis issued a 72-page Memorandum Opinion and Entry of Judgment, finding that no constitutional violations had occurred during the stop, search, and seizure.  Plaintiff appealed, and on August 6, 2010, the Kansas Court of Appeals upheld that decision in Appellate Case No. 102666.  On September 7, 2010, plaintiff filed a petition for review with the Kansas Supreme Court which, to date, has not acted in plaintiff's case.

### III.   Are Defendants Entitled To Qualified Immunity On Plaintiff's Fourth Amendment Claim?

Defendants assert that they are entitled to qualified immunity and thus, summary judgment, on plaintiff's Fourth Amendment claim that they unconstitutionally searched his truck and trailer and seized him and his personal property.  Having asserted this defense, the burden

shifts to plaintiff to establish, on the facts alleged, that defendants violated a constitutional right which was clearly established at the time of the violation.  <u>Vondrak</u>, 535 F.3d at 1204, <u>Swanson</u>, 577 F.3d at 1199.  In determining whether a right is clearly established, the relevant, dispositive inquiry is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation.  <u>Vondrak</u>, 535 F.3d at 1204-05.  Summary judgment based on qualified immunity is appropriate if the law did not put the officer on notice that his conduct would be clearly unlawful.  <u>Id.</u> at 1205.  For a right to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains.  <u>Id.</u>  Officials can still be on notice that their conduct violates established law even in novel factual circumstances.  <u>Id.</u>

A traffic stop is a seizure within the meaning of the Fourth Amendment.  <u>United States v. Bradford</u>, 423 F.3d 1149, 1156 (10th Cir. 2005).  Generally, an investigative detention must last no longer than is necessary to effectuate the purpose of the stop, though an officer conducting a traffic stop may request vehicle registration and a driver's license, run a computer check, ask about travel plans and vehicle ownership, and issue a citation.  <u>Id.</u>  Upon issuing a citation or warning and determining the validity of the driver's license and right to operate the vehicle, the officer usually must allow the driver to proceed without further delay.  <u>Id.</u>  Further detention for purposes of questioning unrelated to the initial traffic stop is impermissible unless (1) the officer has objectively reasonable and articulable suspicion that illegal activity has occurred or is occurring or (2) the initial detention has become a consensual encounter.  <u>Id.</u> at 1157.

Here, plaintiff concedes that the initial traffic stop was valid but argues that the subsequent questioning and detention were not.  To support his argument, plaintiff enumerates the following facts:  (1) Trammel conducted the initial stop in or on the passenger side of the

semi truck; (2) Trammel took the bill of lading and logbook and took them to the patrol car for review; (3) Trammel asked where plaintiff obtained the truck; (4) plaintiff did not appear impaired or fatigued; (5) plaintiff exhibited normal degree of nervousness for a traffic stop; (6) Trammel stated in a radio transmission that he hoped to get plaintiff's attorney's fees; (7) Trammel never informed plaintiff that he was free to leave; (8) after completing the initial traffic stop, Trammel climbed back onto the truck, thus preventing plaintiff from leaving; (9) four officers were on the scene at the point when Trammel climbed back onto the truck; and (10) Trammel never turned off his emergency lights.[3]  Plaintiff does not identify any authority from the Supreme Court, the Tenth Circuit or this or any other court which finds a Fourth Amendment violation under similar facts, and the Court finds them relatively innocuous.

Plaintiff merely attempts to dispute the facts on which Trammel based his reasonable suspicion, either by innocently explaining them or arguing that individually they do not provide a basis for suspicion.  As defendants point out, however, reasonable suspicion does not require an officer to rule out the possibility of innocent conduct, and may arise even if each observation is susceptible to an innocent explanation.  United States v. Guerrero, 472 F.3d 784, 787 (10th Cir. 2007).  Indeed, the Court must not individually evaluate each factor adding up to reasonable suspicion; it must examine how convincingly they fit together into a cohesive, convincing picture of illegal conduct.  Id.

Plaintiff also argues that because Trammel remained in contact with his semi truck after returning his paperwork, the encounter never became consensual and a reasonable person would

---

[3]    Plaintiff also asserts that Trammel exceeded the legal scope of the initial traffic stop by asking to see the bill of lading and logbook and subsequently inspecting them because Kansas law authorizes only Highway Patrol officers to examine commercial documents. Plaintiff cites no authority for this proposition, however, and concedes the validity of the initial stop.  The Court therefore does not reach this issue.

not have believed that he was free to leave.  While cases published before the incident govern the Court's analysis, cases published after the conduct in question can shed light on the fact that the law was not clearly established at the relevant time.  Swanson, 577 F.3d at 1200.  Thus, the Court examines United States v. Paez, No. 09-40006-JAR, 2009 WL 1739907, at *5 (D. Kan. June 18, 2009).  In Paez, District Judge Julie Robinson examined a factually similar case and concluded that when the officer handed back the driver's paperwork and said "thank you, be safe, good luck," the driver's detention was transformed into a consensual encounter even though the officer did not explicitly advise the driver that he was free to go and may have been inside the cab of the semi truck when he asked for consent to continue questioning.  Id. at *6.  Here, as in Paez, neither the testimony of Trammel nor the video of the stop supports finding that Trammel made any coercive show of authority such that a reasonable person would not have felt free to leave.

Finally, plaintiff cites inapposite cases in which officers relied on factors not present here (i.e. staring at officer while adjusting mirror, driving with a suspended license or reluctance to stop) and then argues that the absence of those factors negates reasonable suspicion.  What plaintiff fails to do, however, is present any cases which under the totality of circumstances similar to those here, demonstrate that defendants committed a violation of clearly-established constitutional law.  Thus, plaintiff does not carry his burden to show that defendants violated clearly-established constitutional rights.  Swanson, 577 F.3d at 1200 (10th Cir. 2009) (while plaintiff need not find identical case, must identify legal authority which shows that reasonable official would have known conduct violated constitutional right).  The Court therefore sustains defendants' motion for summary judgment.

**IT IS THEREFORE ORDERED** that Defendants' Motion For Summary Judgment

(Doc. #26) filed July 27, 2011 be and hereby is **SUSTAINED**.

Dated this 18th day of November, 2011 at Kansas City, Kansas.

<u>s/ Kathryn H. Vratil</u>
KATHRYN H. VRATIL
United States District Judge